UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES | CRIMINAL NO. 11-268 |
| VERSUS | DISTRICT JUDGE DEE D. DRELL |
| JAMES LAMAR KELLY | MAGISTRATE JUDGE JAMES D. KIRK |

REPORT AND RECOMMENDATION

Before the court is a Motion to Suppress evidence and an inculpatory statement, doc. #20, referred to me by the district judge for report and recommendation. An evidentiary hearing on the motion was held on March 8, 2012. Defendant is charged in a four count indictment with assaulting the pilot of a helicopter, interfering with the operation of a helicopter, and with theft of mail. It is the statement made two days later to postal inspectors concerning the mail that is the subject of this motion to suppress. Defendant claims the statement is "fruit of the poisonous tree[1]" having been given only as a result of an illegal search of vehicles on the property without a warrant, without probable cause, without any exigent circumstances, and with the mail not having been in plain view.

FACTS

On August 2, 2010, State Police troopers and Winn Parish sheriff's deputies were involved in a drug eradication program. The agents were using helicopters belonging to the national guard to conduct an aerial search of areas they had reason to believe might contain growing marijuana plants. In addition to an agent acting as a spotter and the pilot in each helicopter, there were also agents on the ground in radio contact with the choppers. As one of the helicopters flew near defendant's home,

---

[1] Evidence obtained directly from a violation of the Fourth Amendment, together with the fruits of such illegal conduct, must be excluded from evidence at trial. Wongsun v. United States, 83 S. Ct. 407, (1963).

defendant walked outside to motion the helicopter away because he felt it was flying too close to his home. When standing outside in his underwear waving his arms did not dissuade the aircraft, defendant obtained a 9mm pistol from his home and brandished it, eventually firing it into the air.[2] The crew in the chopper reported it to the ground agents who reported it to their supervisor in charge of the operation. About that time, Kelly phoned the Sheriff's office to complain about the helicopter flying too close to his house and provided his name and address. He also spoke to Senior Trooper Keith Nugent, who was in charge of the eradication program and happened to be at the Sheriff's office at the time, and admitted that he had fired shots to scare away the helicopter. Nugent told Kelly to go outside when he saw the officers arrive at his home.

  Among the officers who were sent to Kelly's home were Deputy Green and Wildlife Agent Rusty Perry. It was thought that it might be helpful if those two officers approached him first since they were known to Kelly. Kelly's house is located right off the road and agents parked along the side of the road as they approached the house. The vehicle with the Deputy Green and the wildlife Agent Perry drove up near the front door, which is visible from the road. There were no fences, posted signs or "keep out" signs. Kelly came out of the house to meet the officers who then handcuffed and Mirandized him. In the meantime, the other officers made their way on foot from their parked cars on the road toward Kelly's house and Kelly, Perry, and Green standing outside.

  There were noted to be three vehicles outside: a red truck (later determined to be disabled), a white truck with blue stripes, and a truck with United States Postal Service markings on it. As they approached the house on foot, officers, including Trooper Turnage, made a protective sweep of the

---

[2] Whether Kelly was shooting directly at the helicopter or not may be an issue for trial, but makes no difference to the analysis here.

parked trucks by looking in their windows. Mail was observed in the red truck and in the white truck with blue stripes. It was on the seats and scattered on the floorboards, and in plastic U.S. Mail totes or bins.

The officers, including Turnage, continued to the house and Kelly received his Miranda rights a second time from Turnage. Permission to search "the property" and retrieve the weapon was obtained and some of the officers entered the house to make a protective sweep of the house. Kelly told the officers that the pistol was on the kitchen table and, in fact, it was found there, unloaded, and under a hat or cap. Kelly admitted to shooting the gun to scare away the helicopter which he felt was encroaching on his home. A search of the open field across the road from the house, from which Kelly said he had shot, was also conducted but no shells or other evidence was found.

The discussion between Turnage and Kelly turned to why the mail was in the trucks and it was learned that Kelly was a contract mail delivery person. Kelly explained that the mail was "junk mail" and that not everyone on his route liked to receive it. Therefore, he saved it and either burned it or took it out with the trash. The officer called his supervisor and asked what to do about the mail and was instructed to contact the postal authorities. The postal agent instructed the officers to seize the mail. Thereafter, the doors to the two trucks were opened and a better view of the mail was seen. Photos were taken and then the mail was seized.

Plaintiff was booked into the parish jail where he gave a written statement. Two days later defendant gave a statement to U. S. Postal Service OIG Special Agent, Chris Lanham which is the subject of this motion to suppress.

Discussion

Defendant, through counsel, seeks to exclude from evidence at the trial the mail that was

discovered and seized as well as defendant's admissions concerning the mail because the statements were the fruit of an illegal search. Defendant alleges that the permission to search was given as to his house, but not the vehicles or other property. He contends that the vehicles were not close enough to the house to justify a protective sweep or for the mail to have been in plain view and, in any event, the illegal nature of the mail was not readily apparent.

On a motion to suppress, the burden of proof is on the government to show that the search was legal. U. S. V. Roch, 5 F.3d 894, 897 (5th Cir. 1993).

Consent to search

The testimony at the hearing showed that Trooper Turnage asked Kelly if it was alright for the officers to "look around". Deputy Green understood that to mean that the officers had permission to search anywhere on the premises and that there were no limitations. However, it was Trooper Turnage who requested the permission to search and he testified that the only object of a search was to retrieve the weapon and perform a protective sweep of the house. The testimony showed that Kelly had immediately told the officers that the gun was on the kitchen table, which is exactly where it was found. There was no reason to search further, except as necessary to complete the protective sweep of the house. In the context of why permission for a search was requested, it is clear that the extent of the permission extended only to locating the pistol. I find that the consent to search did not encompass the vehicles outside.

Protective sweep

A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. Maryland v. Buie, 494 U.S. 325 (1990).

A protective sweep was appropriate for the house when officers entered. The officers entered

the house to retrieve the gun and it was permissible for them to make a cursory inspection inside the house to be sure no one was hiding there who could endanger them.

The testimony of Trooper Turnage also reflected that a protective sweep of the vehicles and front yard had already been made for officer safety as the officers approached the house. Defendant argues that the vehicles in which the mail was found were not near enough to the house to justify a protective sweep. However, the testimony of Trooper Turnage and others showed that it was necessary to look in the trucks as the officers passed them to be sure nobody was hiding in them who could attack them from their back as they approached the house. The trucks were situated between the road, where the officers had parked their vehicles, and the house. Although it was not clear from the testimony exactly which officers looked into which truck, there is no suggestion by defense counsel that the officers–whoever they were–did not look in the trucks as they walked toward the house.

However, even if the officers had not been performing a protective sweep as they approached the house, they had a legal right to be where they were when they looked into the trucks and observed, through the trucks' windows, the large volume of mail in two of the three trucks. The officers had a legal right to enter the property to interview Kelly and Kelly had been told to expect them and to come outside to meet them when they arrived. The evidence showed that, while all of the mail was not in "plain view", much of it was.

<u>Plain view</u>

Under the plain view doctrine, evidence may be seized without a warrant if authorities are lawfully in a position from which they can view the evidence, if the incriminating nature of the evidence is immediately apparent, and if the authorities have a lawful right to access the evidence.

U. S. V. Waldrop, 404 F.3d 365, 368-9 (5th Cir. 2005), citing Horton v. California, 110 S. Ct. 2301 (1990). See also, Kentucky v. King, 131 S. Ct. 1849, 1858 (2011); Minnesota v. Dickerson, 113 S. Ct. 2130, 2136-7 (1993).

    Kelly voluntarily admitted to Trooper Turnage that he was in possession of U. S. mail. This statement, which was made after the agents lawfully observed the mail and before any seizure of the mail had occurred, was lawfully obtained and was enough evidence for Special Agent Lipham to interview Kelly two days later. The fact that the mail was later seized (after defendant had admitted he was in possession of undelivered U. S. Mail) had no bearing on the lawfulness of the statement taken by Lipham.

    In other words, regardless whether the truck doors had ever been opened and the mail seized, the officers, and later Lipham, knew the large volume of mail was in the trucks because it was in plain view and the defendant admitted that it was undelivered mail belonging to other people. This alone, irrespective of seizure, gave Lipham reason to believe a crime had been committed and reason to question Kelly. Kelly was then given his Miranda rights (for a third time) by Lipham and Kelly voluntarily made an incriminating statement to him.

    In summary, therefore, I find that, although the later consent to search given by Kelly did not encompass the vehicles, the officers had a legal right to be where they were when the mail was discovered, they had a legal right to conduct a protective sweep of the vehicles, that, even had there been no protective sweep, the evidence was in plain view and, regardless whether it was apparent that it was contraband or evidence, it gave officers a reason to question Kelly who voluntarily discussed it with the officers. This confession to Trooper Turnage led to the continued investigation by Special Agent Lipham and the lawfully obtained statement two days later. The statement, given

by Kelly to Agent Lipham two days later, was voluntary and was given after having been advised of his Miranda rights a third time and is not the fruit of an illegal search or seizure.

Seizure

A finding that the seized mail is admissible is compelled by the discussion and analysis above. As noted above, a seizure pursuant to the plain view doctrine is only proper is the officers were lawfully in the place where they observed the contraband, evidence or fruits of crime, its nature was immediately apparent and the officers had a legal right to access it. As discussed above I find that the officers had a legal right to be where they were when they looked into the trucks and they had a legal right to look into the trucks. I find that the illegal nature of the mail was immediately apparent for three reasons: First, there was a very large volume of mail discovered. Second, the mail was not in a U. S. Mail marked vehicle. Third, the mail was found in more than one vehicle. These facts were sufficient to show a reasonable person that defendant was in possession of mail which didn't belong to him and that was not simply about to go out for delivery in the normal course. As defendant has admitted in brief: "[e]vidence in plain view may be seized provided that the authorities did not violate the Fourth Amendment in arriving at the spot from which the observation is made. Kentucky v. King, 131 S.Ct 1849, 1858, . . . (2011) ; Minnesota v. Dickerson, . . . 113 S. Ct. 2130, 2136-2137 . . . (1993) ." Here the evidence was seized after it was discovered in plain view . But it was also seized only after the defendant had admitted that it was contraband, that is mail that he had no right to possess. Following his admission, it was proper to seize the mail. A warrant was not required and, in fact, would have served no purpose.

For these reasons, IT IS RECOMMENDED that the motion to suppress be DENIED and that the mail and the admissions be ruled admissible.

**OBJECTIONS**

Under the provisions of 28 U.S.C. § 636(b)(1)© and Fed.R.Civ.P. 72(b), the parties have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the clerk of court. No other briefs or responses (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection tot he magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this 25th day of May, 2012.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE